IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.  CRIMINAL ACTION NO. 3:21-00120

JABAR MARKEITH SELLERS

**MEMORANDUM OPINION AND ORDER**

Pending before this Court is Defendant Jabar Sellers' (Defendant) Motion to Suppress Evidence.  ECF No. 29.  A hearing was held to take evidence and hear parties' arguments on this issue on September 20, 2021.  ECF No. 43.  For the following reasons, the Court **DENIES** Defendant's Motion.

**BACKGROUND**

This case arises out of an investigatory stop of Defendant's vehicle pursuant to the investigation of a shooting that occurred on June 29, 2021.  The shooting occurred on the 1100 block of 17th Street in Huntington, WV at approximately 10:35 PM.  The victim was shot but survived.  He identified the assailant and noted that there was an unidentified individual with the shooter.

Officers located timestamped surveillance footage covering different viewpoints along Charleston Ave, near where the shooting occurred.  The footage showed that a white sedan pulled up and parked in front of 1709 Charleston Ave from the direction where the victim was located. The driver appeared to exit the vehicle at 10:33 PM and walked toward the direction of the shooting.  The driver returned to the vehicle at a hurried pace at 10:35 PM accompanied by another individual who ran to the vehicle and entered.  The car drove eastbound on Charleston

Ave shortly thereafter, and surveillance footage showed the vehicle's side profile and rear angle profiles as it drove by. The driver and passenger of the vehicle could not be seen. Special Agent of the ATF Sean McNees (SA McNees) was involved in the investigation of this shooting, and pursuant to his review of the footage, he believed the vehicle to be a white Lexus sedan.

SA McNees interviewed the victim of the shooting on July 6, 2021. The victim identified the shooter, who is believed to be a member of the "Gangster Disciples," a violent street gang. The victim also indicated that the individual present at the shooting was a heavy-set black man wearing a white-t shirt. The victim described the events of the shooting, telling SA McNees that when the shooter pulled out the gun and pointed it in his face, the other individual directed the shooter to "blow and let's go." The shooter then fired the gun into the victim's face. The victim believed that a white vehicle was involved, and although he could not be sure of the vehicle model, he thought it could be a Chrysler 300.

On July 7, 2021, SA McNees and other investigators conducted surveillance on Norway Ave, near where the shooter resided at 114 ½ Norway Ave, approximately 0.8 miles away from the shooting and in the direction that the suspect vehicle was last seen driving. While conducting surveillance, a white Lexus ES 350 sedan with a sunroof and silver wheel rims—a vehicle which matched the vehicle seen on the footage—pulled into the parking lot adjacent to the shooter's apartment building. Officers watched as the shooter came out of the building and entered the vehicle. The officers observed that the driver was black. Defendant was the driver of the vehicle.

When the vehicle left the parking lot, SA McNees signaled for a marked Huntington Police Department (HPD) unit to stop the vehicle. SA McNees arrived on the scene when the traffic stop occurred. SA McNees recognized Defendant from previous drug investigations and knew of his

felony record.  Defendant, a heavy-set black man approximately 6 feet tall, was ordered out of the vehicle and immediately placed in handcuffs while a pat-down frisk occurred.  No evidence was recovered from this pat-down.  SA McNees asked Defendant if there were any weapons in the car and Defendant admitted that there was a gun in the vehicle.  Officers then recovered a loaded Smith & Wesson, model 442-2, .38 special caliber revolver from the pocket of the front driver's door.  Defendant was arrested for being a felon in possession of a firearm.  Defendant admitted to possessing the gun because he was scared for his life.

Defendant was taken to the police station, where he was *Mirandized* and interviewed, during which he made additional incriminating statement regarding the possession of the gun.  A criminal Complaint was sworn out against Defendant charging him with one count of being a Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) on July 8, 2021, and he was arrested the next day.  A grand jury returned a single-count Indictment charging him with the offense on July 30, 2021.  On September 7, 2021, Defendant moved to suppress the evidence recovered at the scene of the vehicle stop including the firearm and statements he made to officers.  Defendant argues that the stop violated his Fourth and Fifth Amendment rights.

## DISCUSSION

The Court will turn to each step of the encounter and analyze whether the officers' actions during the stop of Defendant on July 7, 2021, violated Defendant's constitutional rights.

1. <u>Officers had a reasonable suspicion to justify the initial stop of Defendant's vehicle</u>

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures…"  U.S. CONST. amend. IV.  It is well established that an officer may briefly stop and detain a person for investigative purposes when the officer has a "reasonable suspicion" based on concrete, articulable facts that

"criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion is a standard less demanding than probable cause, but a "mere hunch" in insufficient to justify a stop. *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016) (citing *United States v. Massenburg*, 654 F.3d 480, 485 (4th Cir. 2011)). A totality of the circumstances approach is taken to determine whether such reasonable suspicion exists to justify the initial stop. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). A court may consider the information known to the officer and reasonable inferences that can be drawn. *Id.* The reasonable suspicion standard is considered a "commonsensical proposition." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993).

Here, Defendant argues that the officers lacked reasonable suspicion to justify the initial stop, but this assertion cannot be reasonably supported. Several factors support a reasonable suspicion finding, including the fact that Defendant's vehicle matched the vehicle seen on surveillance footage, Defendant matched the description of the unknown individual provided by the victim and seen in the video, and Defendant had just met with the known shooter prior to the stop. When SA McNees observed Defendant on July 7, 2021, he and the other officers involved in the stop were actively investigating a recent shooting in the area. The vehicle that SA McNees observed pulling into the parking lot adjacent to the residence of the known shooter matched the vehicle seen in the surveillance footage recovered from Charleston Ave. During his review of that footage, SA McNees identified several features of the suspect vehicle, including: the shape of the grille, the headlights, and the side mirrors; the profile of the vehicle; the trim above the license plate; the taillights; the vehicle color; a sunroof; and silver wheels. Based on these features, SA McNees believed that the suspect vehicle was a white Lexus sedan. This footage also corroborated the victim's statements regarding the shooting, including the presence of a white

vehicle and the number of people involved. The victim's description of the unknown individual as being black also matched Defendant.

Shortly after Defendant pulled into the parking lot on Norway Ave, the known shooter exited his apartment building and entered Defendant's vehicle. He was in Defendant's vehicle for a brief time, and then he left.

The totality of these circumstances—the surveillance footage, the victim's statement, and SA McNees' observations that day in the parking lot of the shooter's residence—supports a finding that SA McNees had reasonable suspicion to believe that Defendant's Lexus ES 350 sedan was the same vehicle from the shooting incident and that Defendant was the previously unidentified individual involved in the shooting. This reasonable suspicion justifies the initial stop.

2. The officers lacked a reasonable suspicion that Defendant was dangerous at the time of the stop

During the course of a lawful *Terry* stop, an officer may ask a driver to exit the vehicle without violating Fourth Amendment rights. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n.6 (1977). Additionally, "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest." *United States v. Leshuk*, 65 F.3d 1105, 1109–10 (4th Cir. 1995); *United States v. Elston*, 479 F.3d 314, 320 (4th Cir. 2007). However, officers cannot automatically conduct a pat-down search; the officer must have a reasonable belief that a person is armed and dangerous in order to frisk for weapons. *Terry*, 392 U.S. at 27; *United States v. George*, 732 F.3d 296, 299 (4th Cir. 2013). An officer need not be "absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his

safety or that of others was in danger." *Terry*, 392 U.S. at 27. Several factors can aid the court in its determination of whether there was a reasonable suspicion for an officer to believe a person may be dangerous, including: the context of the stop; the crime rate in the area; nervous or evasive behavior of the suspect; and a suspect's suspicious movements. *George*, 732 F.3d at 299–300. If the officers do have a reasonable belief that the suspect is dangerous, they are similarly permitted to do a protective search of the suspect's vehicle. *Elston*, 479 F.3d at 320; *Michigan v. Long*, 463 U.S. 1032, 1051–52 (1983). Such search is authorized even if a suspect is detained at the time of the search, because the suspect may escape restraint or regain access to a vehicle where a weapon may be located. *Elston*, 479 F.3d at 320. In these situations, concerns for officer safety justify the searches. *Long*, 463 U.S. 1052.

The Government here argues that the immediate pat-down of Defendant was justified by a reasonable belief that he was dangerous and armed. The Government relies on *United States v. Holmes* to support this position, where the Fourth Circuit held that officers had reasonable suspicion to believe that one of the occupants of a vehicle was a violent gang member. 376 F.3d 270, 277–78 (4th Cir. 2004). Specifically, the Government cites to the language that "reasonable suspicion of a suspect's dangerousness need not be based solely on activities observed by the police during or just before the relevant police encounter, but can be based on the suspect's commission of violent crimes in the past—especially when those crimes indicate a high likelihood that the suspect will be 'armed and dangerous' when encountered in the future." *Id.* at 278 (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)). Further, the *Holmes* court held that a "suspect's cooperation with police officers during a *Terry* stop does not, by itself, extinguish concerns that police may harbor about that suspect's dangerousness." *Id.* But this reliance is misplaced. In *Holmes*, the reasonableness of the officers' suspicion was based on the *suspects'*

criminal history and the *suspects'* membership in a dangerous and armed gang. *Id.*; *see also Hensley*, 469 U.S. at 235 (finding that officers had reasonable suspicion to take steps to protect their safety when the suspect was reportedly armed and dangerous). Here, Defendant was not identified as the shooter in the incident eight days prior. There was no suggestion that the unidentified individual at the shooting possessed a weapon himself. Additionally, there was no indication that police believed Defendant to be a member of a violent and dangerous gang known to carry weapons, as was the case in *Holmes*. SA McNees recognized Defendant when he exited the vehicle and was familiar him from a previous drug investigation—notably, not an investigation involving violence or dangerous weapons.

The Government similarly relies on *United States v. Thomas* to support the officers' immediate pat-down of Defendant. 997 F.3d 603 (5th Cir. 2021). In *Thomas*, officers conducted an investigatory stop of a group of people who were gathered by a vehicle which had been stolen in an armed robbery ten days prior. *Id.* at 607. When officers conducted the stop, they did not know how many individuals were involved in the crime, nor were they aware that the robbery had occurred ten days before, although they did know it had not occurred within the last few minutes. *Id.* at 607, 611. The officers were unfamiliar with Thomas, and their suspicions were based only on his presence in a high-crime area, his proximity to the stolen vehicle, and his interactions with the others around the vehicle. *Id.* The officers were also outnumbered six to two and could not secure all individuals because they only had four sets of handcuffs. *Id.* at 614–15. In this case, the Fifth Circuit found that, based on all of these circumstances, there was a reasonable suspicion that Thomas was armed and dangerous. *Id.* at 615.

*Thomas* differs significantly from the case at hand. Where the officers in *Thomas* were unaware of the significant time gap between the robbery and the stop, here, officers were well

aware that it had been eight days since the shooting they were actively investigating. Further, the officers in *Thomas* did not know which men out of the six men present at the scene of the stop were involved in the armed robbery, and therefore which men were more likely to be armed; here, the officers already knew the identity of the shooter. Only the shooter was known to have a weapon; there was no evidence that the unidentified individual from the shooting had a weapon of any kind. The officers in *Thomas* were also outnumbered by the suspects, and concerns for their safety were heightened, whereas here, officers outnumbered Defendant.

The totality of the circumstances here does not support a reasonable suspicion that Defendant was armed and dangerous before he was frisked. Defendant complied with the HPD unit's directive to pull over and exited his vehicle when asked. The HPD unit's dashboard camera footage shows that Defendant was compliant and calmly mannered throughout the duration of this encounter. The fact that he met briefly with the shooter before the initiation of the stop does is not enough to support a reasonable suspicion that Defendant was armed and dangerous. These factors, coupled with the temporal distance between the time of the shooting and the time of the stop, the fact that the unidentified individual at the shooting was not seen with a weapon, and the fact that SA McNees recognized Defendant from a previous, non-violence related investigation, indicate that it was not reasonable for officers to believe that Defendant was dangerous.

However, despite the unlawfulness of this frisk by officers, no evidence was gained from this search.

3. <u>Officers are entitled to ask whether a person has a weapon in the interest of officer safety during a *Terry* stop</u>

The Supreme Court has held that traffic stops pose a certain danger to police officers and therefore officers "may need to take certain negligibly burdensome precautions to complete [their]

mission safely." *Rodriguez v. United States*, 575 U.S. 348, 356 (2015). "Unlike a general interest in criminal enforcement, however, the government's officer safety interest stems from the mission of the stop itself." *Id.* Courts have recognized that officers have the authority to "inquire about dangerous weapons" during the course of a traffic stop. *United States v. Everett*, 601 F.3d 484, 495 (6th Cir. 2010); *United States v. Jackson*, 280 F.3d 403, 405 (4th Cir. 2002) ("[D]uring this *Terry*-like stop, [the officer] was fully justified in inquiring into whether Jackson had any weapons in the van."); *United States v. Racer*, No. 2:20-cr-00095, 2021 WL 1342536, at *2 (S.D.W. Va. April 9, 2021); *United States v. Martin,* 395 F. Supp. 3d 756, 760 (S.D.W. Va. 2019) (Courts "have already recognized the authority of officers conducting a traffic stop to inquire about dangerous weapons." (internal citations omitted)). Indeed, the Fourth Circuit recently ruled on this issue, and found that an officer's question to a suspect inquiring whether there was anything illegal in the vehicle related to officer safety. *United States v. Buzzard*, 1 F.4th 198, 203 (4th Cir. 2021). In the interest of officer safety, officers are permitted to ask whether a person has a dangerous weapon, as this question relates "to the mission of the stop itself and it does not violate the Fourth Amendment." *Racer*, 2021 WL 1342536, at *3. Therefore, SA McNees' question to Defendant about weapons was lawful.

4. Defendant was not "in custody" for the purposes of *Miranda* when he was asked whether there was a weapon in the vehicle

Statements made during a custodial interrogation are inadmissible unless the officers have provided some sort of "procedural safeguards effective to secure the privilege against self-incrimination," known as *Miranda* warnings. *Miranda v. Arizona*, 384 U.S. 436, 444 (1996). To determine whether an individual is in custody for the purposes of *Miranda*, the test is a totality of the circumstances analysis that looks to whether a "suspect's freedom of action is curtailed to a

degree associated with formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (internal quotations omitted); *Leshuk*, 65 F.3d 1108. These warnings are not required during the course of a brief *Terry* stop, as this kind of stop, while a "complete restriction of liberty," is lawful under *Terry* and does not transform the encounter into a custodial arrest. *United States v. Moore*, 817 F.2d 1105, 1108 (4th Cir. 1987).

Defendant argues that, for the purposes of *Miranda*, he was in custody at the time when SA McNees asked him whether there was a weapon in his vehicle. However, the facts of the event do not support this assertion. It is well established that "officers conducting a *Terry* stop are authorized to take such steps as are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *Id.* at 1109 (internal quotations omitted). This allows officers to handcuff a suspect, place a suspect in a patrol car for questioning, or use or threaten to use force without elevating a lawful *Terry* stop into a custodial arrest for *Miranda* purposes. *Id.* at 1109–10. "*Terry* stops customarily involve 'detentions where the person detained is not technically free to leave while the officer pursues the investigation.'" *Leshuk*, 65 F.3d at 1109 (citing *United States v. Manbeck*, 744 F.2d 360, 376–77 (4th Cir. 1984)). Here, the officers lawfully stopped Defendant to pursue the investigation of the shooting. Pursuant to this investigation, officers were entitled to handcuff Defendant while investigating *without* elevating the encounter into a custodial arrest. Therefore, Defendant was not in custody at the time SA McNees asked about the weapon.

     5.  <u>The search of Defendant's vehicle did not violate the Fourth Amendment</u>

Once a suspect is known to be armed, the suspect poses a serious danger to the officers at the scene of a *Terry* stop. *United States v. Griffin*, 589 F.3d 148, 153 (4th Cir. 2009) (citing *Mimms*, 434 U.S. at 112)). When officers have a reasonable belief that a suspect may have a

readily available weapon in their vehicle, a protective search of the vehicle for weapons is authorized. *Holmes*, 376 F.3d at 280–81; *Long*, 463 U.S. at 1049–50. This is a particular concern during the course of a *Terry* stop, as individuals released after this brief detention regain access to the vehicle, and therefore, to any weapons inside. *Griffin*, 589 U.S. at 154; *Elston*, 479 F.3d at 320 (noting that the Supreme Court in *Long* "ruled that officers conducting a *Terry* stop may carry out a protective search of the suspect's vehicle if they have a reasonable belief that the suspect is dangerous and may gain control of weapons inside the vehicle").

Here, SA McNees lawfully asked Defendant if he had a weapon in the vehicle, to which Defendant replied affirmatively, admitting that he had a gun. This knowledge gave the officers a reasonable suspicion that the suspect was armed, authorizing the protective sweep of the vehicle, as Defendant could have access to the weapon once the *Terry* stop ended.

Once Defendant admitting to having a gun in the vehicle, the officers also had probable cause to search for the gun. *See United States v. Baker*, 719 F.3d 313, 319 (4th Cir. 2013) ("Probable cause to search a vehicle exists when 'reasonable officers can conclude that what they see, in light of their experience, supports an objective belief that contraband is in the vehicle.'" (citing *United States v. Ortiz*, 669 F.3d 439, 446 (4th Cir. 2012)). SA McNees recognized Defendant and knew him to be a felon, meaning he was prohibited from possessing a firearm. His admission to having the gun provided the requisite probable cause to believe that contraband was in the vehicle, authorizing the search.

Therefore, the search of the vehicle for the gun was lawful.

## CONCLUSION

For the foregoing reasons, Defendant's Motion is **DENIED**. ECF No. 29.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel and the defendant, the United States Attorney's Office, the United States Probation Office, and the United States Marshals Service.

ENTER:   October 21, 2021

_____
ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE